IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | 1:13-CR-419 (LMB) |
| | ) | |
| MARK STUART LANDERSMAN & | ) | |
| LEE HALL, | ) | |
| | ) | |
| Defendants. | | |

MEMORANDUM OPINION

This case came on for trial by the Court.  After conducting a separate trial for each

defendant, both defendants were found guilty of the charges in the superseding indictment.  This

memorandum opinion sets out the findings of fact and conclusions of law supporting these

convictions.[1]

I.    PROCEDURAL HISTORY

On November 14, 2013, a federal grand jury returned an indictment charging Mark Stuart

Landersman ("Mark Landersman"), a resident of Temecula, California, with one count of

conspiracy in violation of 18 U.S.C. § 371.  Specifically, he was charged with conspiring with

various unnamed civilian employees of the Department of the Navy ("DON" or "the Navy"), to

obtain an unauthorized DON contract to manufacture 349 suppressors for AK-47 firearms.[2]  The

indictment alleged that the conspiracy had three objects: (1) to willfully engage in the business of

manufacturing and dealing in firearms in interstate commerce while not being a licensed dealer

---

[1] References to the transcripts for Hall's trial will be referred to as "Tr."  References to the Mark
Landersman trial will be referenced as "Tr.ML."

[2] A suppressor is also known as a silencer or firearm muffler.  Tr. 464:9–465:2.  It functions to
reduce both the sound and the flash (light) emitted when a weapon is fired.  Id. at 478:13–16.

and manufacturer of firearms in violation of 18 U.S.C. § 922(a)(1)(A); (2) to deliver unregistered firearms in interstate commerce in violation of 26 U.S.C. § 5861(j); and (3) to cause checks to be delivered by mail for the purpose of executing a fraudulent scheme in violation of 18 U.S.C. § 1341.

Mark Landersman engaged in significant pretrial motions practice, including claims that relevant, exculpatory evidence had been intentionally destroyed by Department of Defense ("DOD") employees, and that because the purchase of the suppressors had been properly authorized by government officials to support classified operations the licensing and registration requirements described in 18 U.S.C. § 922(a)(1)(A) and 26 U.S.C. § 5861(j) did not apply to him. Motions to dismiss the indictment were denied and on March 13, 2014 a grand jury returned a superseding indictment adding defendant Lee Hall ("Hall") to the conspiracy charge (Count I) and also charging Hall alone in Count II with aiding and abetting the conversion of government property by directing a government contractor, CACI, to pay Mark Landersman $1,675,750 of DON funds to manufacture the 349 suppressors, the purchase of which was not authorized, in violation of 18 U.S.C. §§ 641 and 2. Although the superseding indictment did not name Mark Landersman's brother, David Landersman, as an unindicted co-conspirator, the government stipulated that David Landersman was the only unindicted co-conspirator.[3]

Mark Landersman moved for severance, arguing that Hall had indicated he would testify on his behalf if Hall were tried first. Based on that representation, the Court severed the case, trying Hall first. After Hall was tried, Mark Landersman and the government stipulated to the

---

[3] In an indictment returned on September 24, 2015, David Landersman was charged with the same two charges brought against Hall, that is, conspiracy and conversion of government property, respectively in violation of 18 U.S.C. §§ 371 and 641. That case has been designated as complex and will likely be set for a jury trial some time in 2016.

2

record established during Hall's trial [Dkt. No. 322] and added a small amount of additional evidence to the record; however, Hall did not testify at Mark Landersman's trial.

## II. FACTUAL FINDINGS

### A. Lee Hall Trial

Sometime before 2010, Mark Landersman's California machining business, Advanced Machining and Engineering ("AME"), ran into financial trouble. After AME's business became so slow that Landersman could not cover its overhead, one of the men who worked there, Juan Carlos Robles, took over the business. Tr. 405:6–13. When he assumed the business, Robles was one of its two employees and the only one who actually did machine work. Sometime in 2012, Robles changed the name of the machine shop from Advanced Machining and Engineering to I-CAM. Id. at 404:14–15. Mark Landersman's financial troubles continued. For example, a 2011 United States tax return for American Manufacturing and Consulting, Inc., another of Mark Landersman's businesses, showed that the corporation owed David Landersman, $50,000.00. Gov't. Ex. 10-1, at 10 of the S-Corp. 1120(s) filing for 2011, filed July 9, 2012.

David Landersman's efforts to help his brother out of his financial problems by getting him government contracts began at least in 2011. In response to a question from defense counsel, Loren Bremseth, a Navy employee who had worked since 2009 in a role that placed him in a position to know whether there was a Navy requirement for suppressors for AK-47 weapons, testified that sometime in 2011 David Landersman asked him to make a phone call on his brother's behalf. ". . . let me put it in context. [David Landersman] said that his brother was able to produce suppressors that were substantially cheaper than anything that was currently out there and could outperform anything that was out there. He said that to me in person." Tr. 540:21–25. When asked if he had agreed to call the Chief of Staff with this information,

3

Bremseth answered "[David Landersman] asked me to make a phone call. I never did, and I never agreed to." Id. at 541:9–10.

On July 23, 2012, Mark Landersman's financial problems lead him to file a no asset voluntary petition for bankruptcy protection under Chapter 7 of the Bankruptcy Code.[4] Gov't. Ex. 8-1. In his bankruptcy filing,[5] and consistent with Robles' testimony, Mark Landersman listed Advanced Machine [sic] and Engineering as his machine business from October 19, 2005 to June 1, 2010.[6] Gov't. Ex. 8-1, Doc. 11 at 32. He listed no other involvement in, or income from AME; instead he listed his current employment as "manager" of Fourth Street Auto Repair, citing rental income for machines and a draw from Fourth Street Automotive as his only sources of income. Gov't. Ex. 8-1, Doc. 11 at 16. Inconsistently, he listed American Manufacturing and Consulting later in his bankruptcy schedules as his current business and described his involvement with Fourth Street Automotive as ending in June 2009. Id. at 24. Even more inconsistently, in his certification of employment income he indicated that in the 60 days before filing for bankruptcy he was self-employed and received "no payment from any other employer." Id. at 39. He handwrote in that form that he was "taking draws from American Manufacturing and Consulting instead of salary." Id. These conflicting statements about Mark Landersman's businesses and employment are circumstantial evidence that when Mark Landersman represented himself during the fall of 2012 to CACI as President of AME, he made a material false statement

---

[4] On October 23, 2012 he was granted a discharge under Section 727 of the Bankruptcy Code. Gov't. Ex. 8-1, Doc. 20 at 3.

[5] Because the pages in Exhibit 8-1, the bankruptcy proceeding record, are not numbered sequentially, reference will be made to the document number ("Doc.") and then the page within that document.

[6] The frequent misnaming of this business supports the inference that neither it nor Mark Landersman would have ever been approved as a legitimate vendor for a government contract.

to further the fraud object of the conspiracy. Given this filing and Robles' uncontested testimony that he took over AME in 2010, Mark Landersman's representation in 2012 that he was the President of AME was an example of one of the multiple false statements he made during the conspiracy.

The government argued, and the trial evidence clearly established, that Mark Landersman's financial problems were the motivation for the illegal conduct in this case. In 2012, unindicted co-conspirator David Landersman was an SES-level civilian employee of the Department of Navy, holding the title of Senior Director for Intelligence within the Intelligence Directorate of the Office of Plans, Policy, Oversight and Integration ("PPOI"). Gov't. Ex. 3-1, at 4. He reported directly to Robert Martinage ("Martinage"), who was the Deputy Under Secretary of the Navy for PPOI during the time period relevant to this case. Id. at 2; Tr. 48:15–16. In that position Martinage's overall responsibility was to provide foreign policy advice to the Secretary and Under Secretary of the Navy as well as to advise them about security strategy, Navy programs, and budgetary issues. Tr. 48:19–21. In his position Martinage oversaw four directorates: the directorates for capabilities and readiness; policy; intelligence; and security, respectively. Id. at 48:21–24. A directorate is an office with dedicated personnel tasked with certain responsibilities. Each directorate is headed by an SES level senior director who reported to Martinage. Id. at 50:2–5; Gov't. Ex. 3-1, at 2. David Landersman was one of those four senior directors. Defendant Hall was the Deputy Director within the Intelligence Directorate. He reported directly to David Landersman. Tr. 50:24–25.

Although Martinage could suggest to other components of the Navy the weapons they should consider purchasing, he testified that he did not have authority to procure weapons. Id. at

52:4–5.  "If you're talking about weapons systems or those kinds of things, I wouldn't acquire them.  I don't have that authority.  I don't have that kind of budget."  Id. at 49:11–14.

Martinage recalled that some time during the summer of 2013 (on redirect he clarified the year to be 2012, Tr. 108:5–6), David Landersman and Hall asked him whether he would authorize them to approach Carla Lucchino ("Lucchino"), the Navy's Assistant for Administration to determine whether there were any end-of-the-year funds available to pay for some intelligence studies they wanted to have conducted and also to hire some part-time personnel to help with various special projects.  Id. at 55:9–16.  Martinage approved their requests to approach Lucchino.  Id.  After giving that approval, Martinage did not have any further involvement with this procurement until the spring of 2013 when authorities discovered that instead of studies, the procurement had been for 349 suppressors.[7]  Id. at 55:21–25. Specifically, Martinage testified that he neither approved the acquisition of any suppressors nor was ever consulted about changing the funding request from supporting studies to purchasing suppressors.  Id. at 65:19–23, 70:20–23.

_____

[7] Martinage was a key witness for defendants' claim that the procurement of the suppressors was authorized.  During cross examination defendants attempted to identify areas where Martinage provided inconsistent statements to investigators.  See Tr. 86:11–15.  In particular, defendants attacked Martinage's memory of how much he thought the proposed studies would cost, id. at 87:9–90:17 and whether he had even had a discussion with Hall regarding suppressors.  Id. at 97:18–102:18.  Regarding the last point, Martinage initially told investigators that he had not discussed suppressors with Hall, but later contacted prosecutors when he remembered that Hall had once made a passing comment regarding suppressors.  Id. at 99:2–100:14.

The minor contradictions in his testimony did not undermine Martinage's credibility. Many of the inconsistencies related to ancillary issues or were reasonably explained by Martinage as a result of his complex job responsibilities.  Tr. 67:7–68:25.  Moreover, his testimony regarding the primary issues in this case remained consistent—that although Hall and David Landersman discussed requesting funds from Lucchino to conduct studies, they never discussed, and Martinage never authorized, the use of end of the year funds to purchase suppressors.

6

On June 6, 2013, following the discussion with Martinage about obtaining funding for

studies, David Landersman emailed Lucchino requesting $3 million to fund five studies.  Lee

Hall was one of the persons copied on that email.  The subject line of the email was "operational

budget estimate" and the research projects for which funding was being requested were

described in detail.  The email began with an explanation that the funds were for a classified

project:

> The following is a cut on our SENIOR DIRECTOR of INTELLIGENCE
> operational budget.  All of the items have a classified tail, some more than
> others.  I have noted with an asterisk the ones that have a larger classified
> tail than the explanation here notes.  I will be happy to explain them in
> detail if you wish.

Gov't. Ex. 1-1, at 3.  The email went on to describe the five studies for which funding was being

requested, indicating the estimated cost for each study.

> 1.  The UNSECNAV [Undersecretary Martinage] directed that we conduct
> a series of studies to assess how well DON interests are served by the
> Intelligence Community.  A series of five studies will cover the major
> intelligence disciplines, to include Cyber Intelligence.  The first on Human
> Intelligence is ongoing and is being conducted with reserve support.  Due to
> staff shortfalls, I will use reserve and consultant support to conduct an
> examinations [sic] of the other four and to prepare an overall assessment
> with recommendations.  $1.5M *
>
> 2.  In an effort to maximize utilization of DON resources, my office is
> conducting an Intelligence and Counterintelligence program integration
> assessment for the DON using staff, reserve and possible consultant
> support.  $500K
>
> 3.  Non Acoustic Anti Submarine Warfare (NAASW) is a developing area
> of interest for the UNSECNAV.  I currently oversee and direct a NAASW
> research project for UNSECNAV.  $500K *
>
> 4.  The advent of the Defense Clandestine Service and DON's role in it is a
> topic of interest to the UNSECNAV and the Senior Review Board (SRB).
> At the direction of the SRB, my staff with reserve support is coordinating
> and assessing DON participation in the program.  $250K*
>
> 5.  The UNSECNAV has directed an analysis of the DON collection
> requirements and management process to include an overall assessment of

7

> how well DON intelligence requirements are being satisfied.  My staff with reserve and consultant support will develop an assessment on the issue. $250K

Id.

Lucchino provided unrebutted testimony about how funds were allocated to Navy departments.  Before a department could purchase any goods or services, money had to be allocated from the overall Navy budget to that department.  Tr. 35:5–8.  Typically, such allocation occurred at the beginning of the budget year when the Navy's annual budget was developed.  Id. at 35:14–16.  Throughout the year, money that had not been used for its allocated purpose was returned to the Navy's general fund from which it could be re-allocated to previously unfunded projects on a rolling basis throughout the year.  Id. at 35:16–23.

Lucchino explained that there were two ways to allocate funding.  Id. at 34:13–25. Projects expected to spread over several years were called a "recurring requirement" and needed an official request called a "staffing package" before funding could be approved.  Id. at 34:15– 18.  Projects expected to be completed within the budget year were called "execution year requirements," and could be funded more informally.  Id. at 34:19–25.  For an execution year requirement, such as the one at issue, the person requesting the funding would simply send Lucchino an email describing the request.  In turn, she would have the request evaluated and if it met the relevant budgetary limitations, she would approve the request.  Lucchino did not have carte blanche to allocate funding; instead, she could only allocate funding for new projects from the funds that she was given by the Navy Comptroller every year for operations and maintenance.  Id. at 35:5–11.  In particular, she was not authorized to fund the purchase of weapons or small arms and could not authorize money for purchases related to Navy Intelligence ("NIP"), Marine Corps Intelligence ("MIP"), and counterterrorism ("CT").  Id. at 38:14–17.  She

also explained that requests were more likely to be granted if they were a priority of the Secretary or Under Secretary of the Navy. Id. at 36:1–5.

After Lucchino received David Landersman's email she emailed him to ask who in his office would serve as the point of contact ("POC") for the request. Id. at 36:20–22. In response, Hall emailed that he would take the lead on the procurement. Id. at 37:19–21; Gov't. Ex. 1-1, at 7. Lucchino responded by directing Hall to connect with David Nugent who would handle the funding request for her office. Tr. 38:2. Nugent was the Director of the Financial Management Division within the DON. Id. at 112:11–12. He had worked in the financial area of the DON for 31 years. Id. at 112:21.

Nugent described the $3 million David Landersman was requesting as an unusually high amount given that the department David Landersman oversaw only had an annual budget of between $6 million and $7 million, which included payroll. Id. at 38:8–10, 114:13–20. Due to the high amount requested, Lucchino wanted Nugent to ensure that there was a valid requirement for the funds and that Lucchino's department was authorized to allocate the money. Id. at 38:10–13. In particular, Nugent needed to ensure that the requests were not for Naval or Marine intelligence or counter-terrorism activities. Id. at 38:14–17. Lucchino testified that had the funds David Landersman was requesting not been approved, those funds would have either been allocated to other unfunded Navy projects or returned to the Department of Defense Comptroller. Tr. 40:14–16.

There was no evidence produced during the trial that Nugent ever met or communicated with David Landersman about the request. All of his interactions were with Hall, with whom he had email contact and two meetings to discuss the requirements for the funding. Id. at 120:23–25. During the first meeting, which occurred in July or August 2012, Hall emphasized that the

request was an Under Secretary priority, which as both Lucchino and Nugent explained, greatly increased the likelihood that the request would be approved. Id. at 36:1–5, 121:15–122:7.[8] Although David Landersman had the authority to change the allocation of funds, he did not have authority to allocate funds to a different purpose once Lucchino's office approved the funding. Id. at 43:8–9. Nugent unequivocally testified that Hall never revealed that the funding was actually going to be used to purchase suppressors rather than the studies initially described in David Landersman's email, id. at 122:18–22, 133:7–9, and there was no evidence presented during either trial contradicting that testimony.

Although it is not clear exactly when the decision was made to use the requested funds to purchase suppressors and to purchase them from Mark Landersman, rather than to purchase the studies described in David Landersman's email, the overwhelming circumstantial evidence consisting of an exchange of emails between David and Mark Landersman established that the decision had been made at least by early August 2012, a time period when Mark Landersman was still in Chapter 7 proceedings. On August 13, 2012, David Landersman sent Mark Landersman an email in which he asked for the "proper name of your company." Gov't. Ex. 1-2. Mark Landersman replied the next day providing "Advanced Machining and Engineering (951) 852-1653" as the name and telephone number for his company.[9] Gov't. Ex. 1-4. Two minutes

---

[8] Nugent explained that he was not given any details about the project because Hall said it was classified; however, he ultimately recommended that a reduced amount of funding be approved because his office traditionally paid for studies and analyses similar to what David Landersman had requested in his June 6, 2012 email. Tr. 126:15–127:7, 128:20–22.

[9] Although in 2012 Mark Landersman maintained a checking account with the name of this company, as discussed above, the unrebutted evidence from Juan Carlos Robles was that he had bought AME in 2010 and had continued to operate AME as a machine shop, changing the name of the business to I-CAM sometime in 2012. Moreover, in his bankruptcy filings, Mark Landersman described his association with AME as ending in 2010. It is also worth noting that the address for AME on that checking account was the home residence of Mark Landersman.

after receiving that email David Landersman forwarded it to Hall with the note "Lee, Info is at [sic] follows. . . Advanced Machining and Engineering." Gov't. Ex. 1-4. Later on August 14, 2012, David Landersman sent Mark Landersman an email with the subject "300BLK Suppressors," which included a link to a website and a reference to an article describing how to build a suppressor, adding the comment "Look this over . . . . Looks very much like what we're going to send you . . . . " Gov't. Ex. 1-5 (emphasis added).

The article referenced in that email was a key piece of evidence in establishing that defendants were on notice that federal law prohibited the manufacture of such items without compliance with ATF registration and marking requirements. Gov't. Ex. 5-2. Specifically, the article, which was titled "How I Built a 300 AAC Blackout Suppressor," displayed immediately under the title in bold print: "Warning: you must have a BATFE [Bureau of Alcohol, Tobacco and Firearms] Form 1 with tax stamp before you start to legally build a suppressor. National Firearms Act (NFA) rules apply and you can do hard prison time for violating the law." Id. (emphasis in original). The article also stated: "Don't forget to inscribe or engrave the suppressor with: Serial #[,] Model # . . ." Id. The fifteen-page article included multiple photographs of the fabrication of the components of a suppressor through its final installation on a weapon. Appearing on the last page as the last item, again in bold print, was the same "Warning" as appeared on the first page. Id. About two hours later, Mark Landersman emailed back to his brother, "Wow. Very simple." Gov't. Ex. 1-5.

Based upon Hall's assurances that the requested funds would not be used for either marine or naval intelligence projects, or counter-terrorism efforts, Nugent recommended to Lucchino that a portion of the request be approved and Lucchino ultimately agreed to authorize a

---

Compare Gov't. Ex. 8-1, Doc. 1 at 2, with Gov't. Ex. 9-1. As of December 21, 2012, the balance in the AME account was $0. Gov't. Ex. 9-1.

total of $1.9 million. Gov't. Ex. 1-1. Nugent dropped out of the procurement process until sometime in April 2013 when, after receiving a DD-250 Form which had been signed by Hall, he realized that the allocated funds had been used to purchase suppressors, rather than the authorized studies. Tr. 131:5–15. Nugent recognized that he had not authorized the purchase of suppressors with the funds he had approved, and that Hall had not informed Nugent that the funds would be used to purchase suppressors. Id. at 133:1–9. Once Nugent learned that the funds had not been used for their intended purpose, he contacted Lucchino who directed him to refer the matter to the Naval Criminal Investigative Service ("NCIS"). Id. at 133:23–134:3.

After Lucchino's office approved funding for the studies, Hall had to work with a Navy Contracting Officer Representative (COR) whose job was to help him work with CACI, the government general contractor charged with assisting the Navy in procuring goods and services. Sheri Donahue ("Donahue") was the COR assigned to handle the procurement. Tr. 142:8–9. Although it is unclear how the switch occurred, it appears defendants used a Navy counter-narcotics contract, 11-D-5410 to cover the purchase, which had been switched by that time to cover materials, not studies. Gov't. Ex. 1-6, at 3.

As the CACI witnesses explained, CACI was responsible for evaluating exactly what the government requestor wanted to procure which was usually spelled out in a Statement of Work ("SOW"). Tr. 146:11–12. The SOW enabled CACI to determine which of its contracts could be used to make the purchase. Id. at 185:19–24. CACI would then develop any proposals, handle the bidding process, evaluate the bids and the vendors, cut the invoices and, in general, save the government the time and personnel needed to complete the procurement. Id. at 229:9–19. CACI received a commission only after a particular procurement was satisfactorily completed. Its commission for the procurement at issue was $200,000.00. Id. at 206:15–16.

12

Because the procurement was understood as involving classified issues, CACI's

UPSTAIRS contract was chosen as the contract under which the procurement would be handled.

Id. at 212:20–213:5.  Gail Williams ("Williams"), a CACI senior program manager, was

responsible for overseeing the UPSTARIS contract and for ensuring that schedules were met and

deliverables were completed.  Tr. 174:23–175:11.  She explained that sixty percent of

procurements under the UPSTAIRS contract was for services; however, forty percent was for

materials.  Id. at 176:3–8.  A second CACI witness, Martin Freeman ("Freeman"), who held the

title Procurement Director and had over 30 years of procurement experience, corroborated

Williams' description of the UPSTAIRS contract, testifying that to his knowledge, CACI did not

process the purchase of weapons or silencers under that contract during that time period.  Id. at

297:21–23.  He further testified that if he had known the procurement was for weapons, he

would have escalated the purchase up his management chain.  Id. at 298:1.  CACI's Senior Vice

President, Chief Risk Officer Jerry Reece, confirmed that CACI typically did not procure

weapons, and if CACI knew that a contract was for weapons, it performed a high-level review.

Id. at 389:17–390:6.[10]

As numerous communications between Hall, Mark Landersman, Navy procurement

personnel, and CACI officials showed, describing the procurement as related to a classified

project, enabled Hall and Mark Landersman to hide the true nature of the procurement from

CACI and to block CACI from conducting due diligence into the appropriateness of selecting

Mark Landersman's company as the sole source provider.  It is clear from this record that CACI

---

[10] The purchase order ultimately issued to AME was for 349 "signature suppressors."  Gov't. Ex. 2-6.  Several CACI witnesses testified that they did not realize a "signature suppressor" was a suppressor for a firearm.  For example, Williams thought it was "some sort of electronic signal suppressor, you know, either cell phone, radio, something."  Tr. 191:19–21.

would not have approved AME as a provider had it known that AME did not actually exist as on

ongoing business and that Mark Landersman was in a bankruptcy proceeding.

By the time CACI's Williams met with Hall and Donahue on September 17, 2012, the

nature of the procurement had been switched from obtaining studies to purchasing suppressors

because Williams recalled Hall saying that "he had some work that he wanted done on the

contract . . . and part of it was procuring materials." Tr. 180:13–15.[11]  It is also clear that by

September 17, 2012 Hall had decided to use Mark Landersman's AME as the sole source

because he discussed with Williams what CACI required for a sole source justification.  Id. at

181:4–9.

A month later, on October 19, 2012, Hall emailed Williams that the DON was finally

"ready to move," and provided her with contact information for Mark Landersman, although he

gave her the name Mark Stuart and provided incorrect information about the company's name

and telephone number, writing

> Here is the information you need to get started:  POC [point of contact] Mark Stuart of
> Applied Engineering and Materials Phone: 951-851-1653.  What else do you need?  Also,
> if at all possible, we'd like this rolling by the end of November.  I understand you have
> internal hurdles, but we have accelerated interest in delivering the products.

Gov't. Ex. 2-2, at 2.[12]  This email was one of many containing false statements.  Not only did

Hall provide an incorrect name for Mark Landersman and AME, there was no evidence

introduced at trial of anyone in the DON having an "accelerated interest in delivering the

products."

---

[11] Although Williams remembered Hall mentioning the purchase of materials, she did not recall
them being described as suppressors or silencers. Tr. 180:22–181:3.

[12] The correct name for AME was Advanced Machining and Engineering.

14

Williams responded the same day with an email explaining that she needed a SOW and information about the proposed vendor to justify a sole source purchase, specifically asking, "Why is Applied Engineering and Materials the vendor of choice?" Id. at 1. She then explained that CACI's purchasing department "requires an approved sole source justification or 3 quotes to compare to establish the winning vendor." Id.

In response, Hall emailed Williams asking to see a template for a successful sole source justification. Id. Williams assigned Jason Stewart ("Stewart") to work with Hall on the procurement. Id. In response to Hall's request for a template, Stewart responded by sending Hall a sample of a justification that had been used in a different sole source procurement. Id. The sample language included claims that the sole source currently held "patents and proprietary expertise to the exclusion of all others, . . ." Id. at 4.

On October 23, 2012, Stewart advised Hall by email that he had not been able to find a listing for "Mark Stuart of Applied Engineering and Materials Phone 951-851-1653." Gov't. Ex. 2-3, at 21466. In response Hall wrote ". . . Mea culpa on my part. I had a typo on [sic] the phone number. This company is not on the web for a [sic] their own reasons, which in this case is not a bad thing. The name is right, and the number is 951-852-1653." Id. Hall's statement that "the name is right" was false because both the name "Mark Stuart" and the company name "Applied Engineering and Materials" were not correct. That Hall failed to correct either of those false statements, instead only correcting the telephone number, is further circumstantial evidence of his intent to hide the true nature of this procurement.

On October 22, 2012, Hall sent Williams and Stewart an email in which he wrote "Let me know if this fits the bill," and went on to justify choosing AME as the sole source by explaining among other things:

15

3.  Other subcontractors were not considered due to the fact that they do not possess the expertise required to do the job nor possess the unique proprietary tooling systems created by AME to produce the required enhancements needed. Their proprietary system is wholly, and solely exclusive to AME and therefore unavailable by any other subcontractor.

5.  AME currently has sole proprietary expertise that is not commercially offered by other companies or individuals. It is the only responsible source for the engineering expertise sought and no other services will satisfy requirements. Their product is first that incorporate a unique design that significantly reduces the decibel ratings to near background noise levels.  All technologies are developed and owned exclusively by AME and no licensing agreements currently exist, providing a unique opportunity for CACI and the end customer to utilize proprietary engineering and services not readily available elsewhere.

Gov't. Ex. 2-3, at 21468.

None of these statements were true. As the government showed, there were other established manufacturers who could make suppressors, and Hall and David Landersman were aware of that fact. For example, an email dated September 3, 2012 from Robert Gudz of the International Police Supply to both David Landersman and Hall, bearing the subject "suppressor project," described how a company named Surefire could "custom build" a dis-assembleable suppressor. Gov't. Ex. 1-7, at 1. The email explained that Surefire could make a prototype within one week and would transfer it "via approved ATF paperwork." Id. That email also clearly alerted Hall and David Landersman of the requirement that such items needed to comply with ATF rules and showed that Hall's statement to CACI that no other company had the required expertise to produce the item, was false. Moreover, Hall's description of AME's suppressor as being a "product that is the first that . . . significantly reduces the decibel ratings to near background noise levels" was completely false as there was no evidence produced during the trial that either AME or the DON had ever tested any of AME's suppressors. Although there was evidence of Mark Landersman having made suppressors in the past, there was no evidence

16

that Hall knew about that past conduct and there was no evidence of AME having ever produced

a working suppressor.

On October 23, 2012, in response to further inquiries about the sole source procurement,

Hall sent Stewart an email explaining that,

> The contractor [CACI] will provide the subcontractor [AME] with 50 percent of the
> contract upon completion of the subcontract agreement.  The subcontractor will make
> final delivery of 400 units of item number AME-74KA no later than 30 April 2013.
> Upon delivery, inspection and acceptance trials, the subcontractor will receive the
> balance due.  How's this work for you?  Let me know if I need to change anything.

Gov't. Ex. 2-3, at 21467.  Stewart found the responses provided by Hall sufficient.  Id. at 21466.

After receiving this email, Stewart emailed Christopher Mills ("Mills"), who was in

CACI's purchasing department, asking him to "submit an RFQ [request for quote] for this

vendor," listing at the bottom of the email the incorrect names for both the company and Mark

Landersman:  "Advanced Machinery and Engineering, 41935 Fourth Street, Temecula, CA

92590 POC Mark Stuart 951-852-1653 jetthreat@msn.com."  Gov't. Ex. 2-4, at 21459-60.  In

that same email Stewart alerted Mills that this was not a normal procurement:

> Although they have produced this item before—it is a custom item—they
> have no parts list or retail pricing guide.  No Comps either—as that is the
> reason the government is going to this vendor—there is nothing
> comparable.  Due to the nature of the work they do not have a website and
> are not an advertised company.

> Estimated cost per unit is 5K a piece which puts this PO [purchase order]
> around 2 Million dollars (we are expecting a volume discount in his quote)
> —secondarily—to do this work they expect payment up front of ½ the total
> cost for material purchase.  The customer is aware of this and we will bill
> the 50% to the customer at the time of cutting of the check.

Gov't. Ex. 2-4, at 21459-60.

Over the next several weeks exchanges of emails showed Stewart and other CACI

personnel, including CACI's Federal Lead Buyer, Tom Trillhaase ("Trillhaase"), trying to get

more details about the procurement from Hall and Mark Landersman, both of whom either

provided false information or declined to provide details about the SOW, the basis for choosing

AME as the sole source, and the cost of the items being procured, using the classified nature of

the materials being purchased as their excuse for not providing detailed information.

For example, in responding on October 31, 2012 to a request from Mills, Mark

Landersman replied, "As for your request for information about labor and material, as well as

previous invoices and/or purchase orders, I am not able to provide this information." Gov't. Ex.

2-6, at 20674. He then advised Mills to address all questions to Hall. Id. He also indicated in

that email that he expected a 50 percent deposit. Id. That same email stream reflects that the

customer [Hall] was telling CACI that he had a deadline for Friday and needed the order placed

immediately. Gov't. Ex. 2-8, at 20732. Again, there was no evidence in this record of any time

urgency within the DON for this procurement.

On November 8, 2012, Mark Landersman emailed CACI again referring all requests for

details about the procurement to Hall. ". . . I spoke to Lee Hall about the release of any

documentation regarding the part number you have interest in. He has instructed me to direct

any and all requests for information about this part to him." Gov't. Ex. 2-12, at 20792.

After Mark Landersman declined to provide information regarding details about the

procurement and referred CACI to Hall, Hall in turn told CACI that "The Department

understands CACI's desire to do proper due diligence with regards to this vendor. However, the

sensitive nature of the product(s), past performance and service, and the proprietary information

involved makes increased questioning on these vendor issues makes for [sic] potential problems

later regarding security and classification." Gov't. Ex. 4-2, at 3841. Hall's reference to the

product's past performance and service was a completely false statement as there was no

18

evidence in the record of AME having provided any products or services to the Navy in the past.[13]

On November 12, 2012, in response to an email from CACI's Trillhaase asking for some information about the labor costs, Mark Landersman replied "Machine Shop labor rate is $85.00 per hour for 29 hours per part." Gov't. Ex. 2-23, at 20606. On November 20, 2012, even though he had sold AME to Robles in 2010 and had listed AME in his bankruptcy filing as an entity with which he had stopped being associated as of 2010, Mark Landersman signed a Certificate of Current Cost or Pricing Data affirming those labor costs, signing as "President" of AME. Gov't. Ex. 2-32, at 21203. In addition to the false representation about his status with AME, Mark Landersman's description of his labor costs to produce the suppressors was dramatically contradicted by Robles, the man who actually did the machine work. Robles testified that in late November 2012, Mark Landersman gave him $2,000.00 in cash to buy round aluminum tubing. Tr. 408:9–20. Robles said he worked for four to five weeks, spending about five hours a day to make six to seven inch long threaded tubes and parts based on blueprints Mark Landersman had given him. Id. at 409:18–22, 410:8–9, 410:22–411:12; Gov't. Ex. 5-1.[14] Robles was paid less

---

[13] The testimony of defense witness Rodney Lowell and Defs.' Ex. 32 showed that in early 2011, Lowell submitted an initial proposal to the Navy for a Sustainable Suppress for MK15 Sniper weapons indicating that AME was the "candidate to be tested." Tr. 575:2–13. Due to budgetary problems, AME did not get that contract which would have been for ten suppressors to "be used for government developmental testing to confirm safety for use and document suppressors satisfactorily meet sound and flash suppression requirements." Id. at 575:6–16. This evidence does not show that anyone in the Navy had any actual experience with any AME produced suppressor, and Lowell did not testify that he had seen any AME suppressor actually operate. As this defense exhibit established, all the DON was considering in 2011 was testing ten of AME's proposed suppressors.

[14] More specifically, Robles testified that it took him about four to five minutes to make the tube section and three to four minutes to make each of the six other parts. Tr. 417:5–10. Extrapolating from Robles' unrebutted description of the time he spent on the machine work, and

19

than $10,000.00 for his labor. Tr. 411:20–21. Most of his payment was in cash but he also received one check for $3,000.00 drawn on a Bank of America account on January 26, 2013. Gov't. Ex. 9-10.[15] He explained that this payment occurred approximately two weeks after he finished the machine work, which means the work ended by mid-January. Tr. 413:19.

In response to Mark Landersman refusing to give nearly any information regarding the cost of materials or comparable price quotes, CACI reached out to Hall to confirm that the price was fair and reasonable. Gov't. Ex. 2-21. Hall responded, in toto, "[w]e have determined that the price quote submitted by AME to be fair, reasonable, and accurate." Gov't. Ex. 4-2, at 3842. There was no evidence produced during the trial that Hall or anyone within DON had performed any kind of analysis to determine whether AME's price was fair, reasonable, or accurate.[16]

The purchase order finally went through on December 7, 2012. On December 12, 2012, Mark Landersman emailed CACI asking for the 50 percent payment, falsely claiming he needed that money to start work. "As you may imagine this project is a lot of work and I need to schedule the labor time appropriately to meet the completion date. I can't get started without the deposit check." Gov't. Ex. 2-48, at 21091. On December 14, 2012, CACI mailed a check for

---

even assuming extra time was needed to assemble the parts and paint them, the estimate of "29 hours" per item appears to be a complete fabrication.

[15] The Bank of America check was drawn on an account held in the name Advanced Machining and Engineering listed at Mark Landersman's Rogue Court residence. Gov't. Ex. 9-10.

[16] Because of problems with discovery and the late production of interview reports with Steven Roddell, the Court found that a cost of $5,000 per suppressor might be reasonable if the suppressor were unserialized. That finding, of course, assumed the suppressor would actually meet the standards for flash and sound suppression. The Court did not find that Mark Landersman's price of $5,000 per suppressor was reasonable given the poor quality of the product.

$828,875.00 to Mark Landersman's California address. Gov't. Ex. 9-11.  There was no evidence

in the record showing Mark Landersman needed any money to begin production, and Robles'

testimony showed that by early December 2012, production had already started and was

completed by early January 2013.  Tr. 409:12–19.

      In January 2013, Hall met with Al Zalewski ("Zalweski"), an Office of Navy Intelligence

employee who oversaw a Naval Intelligence warehouse in Maryland, to ask if he could have a

shipment sent to the warehouse.  Tr. 427:2–3.[17]  Hall did not tell Zalewski that he had already

given Zalewski's name and the warehouse address to CACI in December 2012 as the delivery

address for the suppressors.  Id. at 436:8–11.  Although Hall told Zalewski that the contents of

the boxes were not hazardous, he refused to tell Zalewski what the actual contents were.  Id. at

428:3–12.  Zalewski agreed to receive the shipment and Mark Landersman shipped the boxes

from California to the warehouse on February 14, 2013.  They were received there on February

19, 2013, and were maintained in a locked warehouse, but they were placed next to a

photocopier and in an otherwise inappropriate area for classified materials as they were kept in

an open area of that warehouse, accessible to anyone in that space.  Id. at 429:24–30:2.  On April

11, 2013, after NCIS agents contacted Zalewski's family, he called Hall who assured him that

NCIS was not interested in the boxes; however, in that same conversation Hall asked Zalewski to

remove the labels from the boxes.  Id. at 430:3–431:21.  Zalewski testified that although he had

removed labels from boxes in the past; he refused Hall's request.  Id. at 432:1–24.

---

[17] Nearly a month earlier, on December 3, 2012, Hall emailed Stewart advising him that he had
"the delivery address for the goods" listing Zalewski's Chesapeake, MD address.  Rather than
having his name on the label, he advised Stewart to place the notation "Hold for Al Zalewski,"
on the purchase order.  If Hall had been authorized to arrange for this procurement, why would
he not have had his name listed as the recipient?  Gov't. Ex. 2-39, at 51956.

Hall had been placed on administrative leave on February 11, 2013 as a result of an NCIS investigation into an unrelated credential issue. As a result of being on leave he was not authorized to act on behalf of the DON after February 11, 2013. Id. at 252:2–3. CACI's second payment to Mark Landersman was conditioned upon CACI receiving confirmation that goods conforming to the purchase order had been received. Stewart had apparently forgotten to follow-up on the procurement because on March 21, 2013, he sent Hall an email with the subject line "DD-250 for signature." Gov't. Ex. 2-59, at 51873. Attached to that email was a filled out PDF version of a DD-250 Form, entitled "Material Inspection and Receiving Report." Id. at 51874. The form listed 349 signature suppressors at a unit price of $5,422.41. Id. Although he no longer had authority to act on behalf of the DON, Hall signed the DD-250 Form twice. Gov't. Ex. 2-60, at 52002. In the first false statement, he acknowledged that he had accepted the items on February 14, 2013 (even though they were not received at the warehouse until February 19, 2013). Id. In the second false statement, he acknowledged that the materials received conformed to the contract (even though there was no evidence in the record that Hall had inspected, or caused anyone else to inspect or test the items). Id. By each signature he wrote the date February 14, 2013. Id. On the basis of Hall signing the DD-250 Form and returning it to CACI, CACI mailed the second check for $828,875.00 to Mark Landersman. Gov't. Ex. 9-12.

A few weeks after that form was signed, Commander Bernhardt, the Finance Manager for the Deputy Under Secretary of the Navy ("DUSN") PPOI office, brought that DD-250 Form to Nugent. Tr. 131:7–8. When Nugent realized that the form showed the monies he had authorized were not used for their intended purpose he alerted Lucchino, who told him to make a copy of the form for NCIS. Id. 133:5–134:3.

After the suppressors were seized by NCIS investigators in April 2013, they were tested by Jason Davis ("Davis"), a mechanical engineer and weapons expert who worked for the Crane Division of the Naval Surface Warfare Center, the entity that the Navy used to test small arms. Davis was accepted by the defense as an expert in the area of weapons testing. Id. at 472:3–6, 471:11–25. Davis testified that testing the suppressors was more difficult than normal because he usually had requirements from the Navy which he could use for evaluating whether the item being tested performed as expected. Id. at 473:11–15. In this case he had no requirements. Assuming that the suppressors were intended to be used with AK-47 type assault rifles (an assumption not contested by the defense), Davis chose a Chinese-made AK-47 for testing the suppressors. Id. at 477:2–21. Davis chose a Chinese model rather than a Russian-made AK-47 because he had safety concerns about testing the suppressors and it was easier to fire the Chinese model from a fixture. Id. at 477:18–21. Testing from a fixture put the people testing the suppressors at less risk because there was no chance of injury if there were catastrophic failure. Id. at 478:2–6. Although the defense attacked the reliability of Davis' results because he used a Chinese version of the AK-47 weapon, the substitution was reasonable given the safety concerns. Moreover, there was no evidence that the substitution affected the testing results, particularly because the Chinese weapon was "virtually identical" to a Russian-made AK-47 except for the buttstock. Id. at 488:19–24.

Davis tested eight of the 349 suppressors. Id. at 483:9–10. The test results established beyond a reasonable doubt that the suppressors failed to function because they completely failed to meet the standard requirements for both light and sound suppression. Specifically, rather than decreasing the light emitted when the weapon was first fired, the two suppressors tested for light suppression failed by increasing the light emitted between 1200 to 2000 percent. Id. at 483:16–

23

19.[18]  Although the suppressors reduced the amount of light emitted on subsequent shots by 65

percent, that reduction was insufficient to meet the normal requirement that light emitted by a

subsequent shot be reduced by 85 percent.  Id. at 483:21–23, 485:12–14.  Only when the weapon

was fired in a five-round burst did the light reduction reach 85 percent.  Id. at 486:2–9; Gov't.

Ex. 13-1, at 9.

      Davis' testing further established that the suppressors failed to meet the sound

suppression requirement of a 25 decibel ("dB") reduction.  Tr. 486:15–25.  The suppressors

reduced sound by 13.7 to 17 dBs when fired in semi-automatic mode and 15.9 to 16.8 dBs when

fired in automatic mode.  Id. at 486:22–23; Gov't. Ex. 13-1, at 10.

      The suppressors also failed the requirement that they survive the threshold of 3,000

rounds of firing.  Tr. 489:16–490:11.[19]  The four suppressors Davis tested for endurance

respectively survived 180 rounds, 360 rounds, 450 rounds, and 270 rounds before failing.  Gov't.

Ex. 13-1, at 14-25.  In addition, when the suppressors were being tested, they tended to rotate on

the weapon's barrel as it was being fired.  Tr. 494:2–3.  One of the tested suppressors actually

ejected from the host weapon and was propelled forward, while another broke apart during

firing.  Id. at 495:6–10, 496:7–14; Gov't. Ex. 13-1, at 19-24.  In Davis' experience, that many

failures rendered the suppressors unsuitable for use and "a danger to personnel due to the way in

which [the suppressor] fails."  Tr. 497:8–9.

---

[18] Davis explained that the first shot from a rifle with a suppressor will normally emit a brighter
flash than the subsequent firing because the air within a "cold" suppressor is more oxygen-rich,
and therefore, more combustible than the air within a "hot" suppressor.  Tr. 479:14–19.

[19] The suppressors were made of aluminum.  Davis testified that although there is no standard for
the materials used to make a suppressor, using aluminum would reduce the number of rounds
which the suppressor could withstand to less than 500.  Tr. 504:14–505:17.

Defendants did not present any expert to counter Davis' testimony but attacked his findings and conclusions arguing that the requirements he used for testing the suppressors related to a Belgian-made assault rifle rather than a Russian- or Chinese-made assault rifle. Id. at 499:6–500:9. Davis defeated that argument by testifying that the suppressors failed the basic function of being a suppressor in that they increased, rather than decreased, the light emitted on the first shot and failed to suppress the sound emitted by the weapon. Id. at 501:3–17. In addition, Davis explained that the ammunition he used to test the suppressors had a cartridge with less propellant that should have made it easier for the tested suppressors to reduce the light and sound emitted. Id. at 506:21–507:19.

In contrast to the shoddy way in which AME's suppressors were made, Steven Roddell, the owner of Huntertown Arms, a licensed firearms manufacturing company, described how his company produced suppressors. He explained, among other facts, that his company would only use aluminum to manufacture prototype suppressors or suppressors for small firearms because aluminum could not hold up to the heat generated from multiple rounds of firing. Tr. 527:2–6, 531:19–532:3. Similar to Davis' estimation, he testified that an aluminum suppressor would likely fail after 30 to 100 rounds of firing. Id. at 531:19–24.

Roddell also explained how manufacturers get licensed by ATF and authorized to produce suppressors, and he established that his company would have been another source available to the Navy in 2012 for sustainable suppressors for AK-47 weapons. Specifically, he testified that as of February 2012, Huntertown Arms had made sustainable suppressors for AK-47 weapons and had been advertising them on the Internet. Id. at 526:3–10; Gov't. Ex. 5-16 (copy of website). Huntertown's price for these suppressors to its retailers was $279.00. Tr. 533:3–6. Retailers sold them for around $499.00. Id. at 526:13, 533:3–6. On cross-examination